In the Matter of BILL YOUNG & COMPANY, INC., Debtor.

Frederick R. REED, Trustee, Plaintiff,

v.

DAYTON ELECTROPLATE, INC., Defendant.

Bankruptcy No. 1–87–04107.
Adv. No. 1–88–0065.

United States Bankruptcy Court, S.D. Ohio.

Oct. 6, 1989.

Gregory Ruehlmann, & Mark Norman, Vorys, Sater Seymour & Pease, Cincinnati, Ohio, for plaintiff.

Jeffrey Marks,—Taft, Stettinius & Hollister, P. Michael McCauley, Cincinnati, Ohio, for debtor.

FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

J. VINCENT AUG, Jr., Bankruptcy Judge.

This matter came on for trial before the Court on May 22 and 23, and June 7, 1989 on the Complaint for Turnover Order, filed by Frederick R. Reed, Trustee for the estate of Bill Young & Company, Debtor in Case No. 1–87–04107, a Chapter 11 case, and the Counterclaim of Dayton Electroplate, Inc. ("DEI"). The trustee's complaint asserts a claim for recovery against DEI on a business account for goods sold by Debtor to DEI prior to the filing of Debtor's petition for relief under Chapter 11. DEI's counterclaim seeks recovery for damages resulting from negligence and breach of contract in the performance of services by Debtor in connection with the sale of goods.

We find that the Trustee is entitled to judgment in his favor on his turnover complaint. We also find that the Trustee is entitled to judgment in his favor on DEI's counterclaim.

The Court having considered evidence offered by the parties, the stipulation of facts as set forth in their Joint Pre–Trial Statement, the arguments of the parties, and the parties' respective proposed findings of fact and conclusions of law, and being otherwise sufficiently advised, hereby makes and enters the following Findings of Fact and Conclusions of Law, pursuant to Bankruptcy Rule 7052.

FINDINGS OF FACT

1. On November 20, 1987, Bill Young & Company filed a voluntary bankruptcy peti-

tion in the United States Bankruptcy Court for the Southern District of Ohio, Western Division, Case No. 1–87–04107. Frederick R. Reed was appointed Trustee in the bankruptcy action.

2. On March 22, 1988, the Trustee filed a Complaint for Turnover Order against DEI to collect money owed by DEI to Bill Young & Company.

3. Bill Young & Company was a supplier of chemicals and equipment to the electroplating industry. It supplied proprietary chemicals, generic chemicals, equipment, and stripping chemicals to DEI.

MacDermid, Inc. is a supplier of proprietary chemicals. MacDermid supplied chemicals to Bill Young & Company, but is not a party to this lawsuit.

4. DEI obtained relief from the automatic stay and asserted a counterclaim against Bill Young & Company alleging damages arising out of breach of contract and negligence.

DEI claims that Bill Young assumed the duty to provide technical chemical expertise to DEI's electroplating business and that Bill Young breached that duty by failing to realize that the "low concentration" chemical mixture it was recommending resulted in a large number of defectively plated goods and scrap parts.

5. DEI is an Ohio corporation whose sole shareholder is Charles J. Borum. It was incorporated in May, 1984, for the purpose of purchasing certain assets of Dayton Rustproof, a company in the electroplating business. DEI is in the business of electroplating parts manufactured by other companies. DEI primarily plates wire goods, such as fan guards and wire shelving; metal stamped goods, such as computer housings; and other metal parts, such as refrigerator shelving brackets, refrigerator and oven door handles.

*Electroplating*

6. Electroplating is a process of depositing a metal finish on a part by means of passing an electric current through a solution which includes the metal. An electrical current is generated and passed through the metal which is being plated (the anode), then through the conducting solution, depositing the metal on the surface of the part to be plated (the cathode).

7. In nickel electroplating, the electrons passing through the current change the electrically neutral nickel into nickel ions, positively charged particles, which then travel to the cathode, the part to be plated, and are deposited as nickel on the surface of the part.

8. DEI uses automatic platers in its nickel and nickel-chrome plating operation. The part to be plated is suspended from a rack and the part is automatically transferred from one tank to another during the course of the operation. The first part of the nickel and nickel-chrome plating operation is the cleaning and rinsing cycle, which is followed by the nickel plating. The operation is then followed by another series of rinsing, followed by chromium plating and then once again, rinsing.

Surface finish, roughness, weld marks, and spatter, among other things, are defects from the part fabricator which can affect the plating process.

9. Parts may be plated for a variety of reasons, including the prevention of rusting, general appearance, and the production of base metal parts with the surface properties of a metal such as nickel, but which would be produced at a lesser cost than one of solid nickel.

10. Nickel sulfate, nickel chloride and boric acid are basic chemicals, or commodities used in a nickel plating bath.

Proprietary chemicals include the conditioners, brighteners, and wetting agents which are added to the bath. A proprietary chemical is one which is normally produced through a patented process.

11. The basic formula deposits what is characterized as a dull nickel finish. Organic additives have been produced which permit a modification of the grain structure of the nickel to impart brightness to the finish, commonly referred to as a bright nickel process. The additives generally consist of a control agent, primary and secondary brighteners and wetting agents.

12. During the 1970's, the electroplating industry faced problems with respect to costs and treatment of pollution. As a result, lower concentration nickel plating formulas were developed. Dayton Rustproofing and DEI used a low concentration formula.

Throughout the time period in which DEI used the low concentration formulation, it experienced a problem in its nickel plating operations in that a number of parts, whether plated with nickel alone or nickel and chrome, yielded defective plating. These defects were manifested primarily in the form of "burns" at high current density areas and very thin plating in low current density areas. Efforts by DEI to rectify these problems by adjusting the DC current flow were to no avail. Increasing the current to alleviate poor plating in the low current density areas resulted in "burning" in the high current density areas, while decreasing the current to avoid "burning" in the high current density areas resulted in thin plating in low current density areas.

Prior to the fall of 1987, the period during which the low concentration formulation was in use at DEI, Mr. Borum, the owner of DEI, estimated the percentages of parts that manifested defects ranged from approximately 8% to 30%. Upon conversion to a bath with an increased sulfate concentration in November of 1987, Mr. Borum estimated his reject rate to be in the range of 2%. He also switched to another chemical supplier.

DEI, however, did not keep records of defectively plated parts or scrap parts during the period from June, 1984 to October, 1987.

### Charles J. Borum and DEI

13. Charles J. Borum, the sole shareholder of DEI, has an engineering degree from the University of Texas and a law degree from the American University, Washington College. He is a member of the bar of the State of Ohio. At one time, he was a member of the patent bar.

14. Mr. Borum left employment with Hobart Industries in 1983 or at the end of 1982. He had begun with Hobart as a patent lawyer and then went into management. He was senior vice president of Hobart Industries at the time of his retirement, and was also a member of the Board of Directors until Hobart Industries was acquired by Dart–Kraft. Mr. Borum was one of the chief financial officers of Hobart Industries.

15. Mr. Borum and the principals of Dayton Rustproof came to an agreement regarding DEI's purchase of the assets of Dayton Rustproof some time in April, 1984. The purchase of certain of the assets of Dayton Rustproof was concluded on or about June 1, 1984. Charles J. Borum did a careful review of the financial aspects of Dayton Rustproof and developed a business plan to determine that the business was viable and that he had an interest in purchasing it.

16. On a frequent basis in March, April and May, 1984, Mr. Borum was present at Dayton Rustproof. This even included going there at night and watching the night shifts run, and talking to various employees.

17. Prior to the purchase of Dayton Rustproof, Charles Borum began reading technical books on plating, as well as other periodicals. He also had available to him technical literature from MacDermid Chemical Company and understood the basic principles of electroplating.

18. In May or June, 1984, Mr. Borum became aware that DEI was running a low concentration bath. At trial, he testified that he recalled Mr. Greene saying the bath was run differently than the MacDermid technical data sheet advised.

19. Prior to the purchase of the assets of Dayton Rustproof, Mr. Borum felt that Bob Greene and Bill Young & Company were providing good service to Dayton Rustproof.

20. Prior to the execution of the agreement to purchase certain of the assets of Dayton Rustproof, Charles J. Borum recognized what he perceived to be a high level of scrap and defectively plated parts in

both the zinc and nickel plating operations of Dayton Rustproof.

On June 1, 1984, Charles Borum began instituting production changes to improve quality control both in the zinc and nickel plating operations of DEI. (The problems on the "zinc side" of the business were rectified and are not part of this lawsuit.)

21. In May, 1984, Charles Borum met with Bob Greene and Richard Evans, then president of Bill Young & Company, to discuss a relationship between Bill Young & Company and DEI.

22. At the meeting, Charles J. Borum asked if Bill Young & Company would continue to supply chemicals and related technical assistance if Mr. Borum bought Dayton Rustproof. Mr. Borum also requested assurance that Mr. Greene would continue to service the account.

23. Bill Young & Company agreed to provide proprietary chemicals to DEI and to provide technical support services in connection with the use of those chemicals. Bill Young & Company also agreed to supply basic chemicals and equipment. There were no specific orders for chemicals or equipment at that time. It was merely understood that Bill Young & Company was willing to provide material and services if requested by DEI.

24. No agreement or understanding with Bill Young & Company prevented DEI from seeking an outside consultant with respect to its nickel plating operation, or any of its other operations.

25. There was no aspect of the understanding or agreement between Bill Young & Company and DEI that prevented DEI from having the composition of its baths tested by sources other than Bill Young & Company.

### Bob Greene and DEI

26. Bob Greene was employed by Bill Young & Company from May, 1972 through October, 1987 as a sales representative. DEI was one of the customers to which Bob Greene was assigned by Bill Young & Company. He visited DEI at least once a week.

27. From approximately 1975 or 1976, Robert Greene called on the Dayton Rustproof account.

From approximately 1980 or 1981, Bill Young & Company supplied proprietary and generic chemicals to Dayton Rustproof to use in its nickel plating baths.

28. Dayton Rustproof ran a low concentration formula in its nickel baths prior to Bob Greene servicing the account.

After Bill Young & Company began providing proprietary chemicals for the nickel plating baths, Dayton Rustproof continued to run the nickel baths with a low concentration formula.

29. Bob Greene and John Thomas, the DEI operations manager, measured the various tanks at Dayton Rustproof and he (Bob Greene) compiled what is generally referred to as the "grey book" which indicated the size of the various tanks and the operating parameters of the baths, including the nickel bath composition formulas.

30. At the time DEI purchased the assets of Dayton Rustproof, John Thomas stayed on as operations manager of DEI.

31. Initially after the purchase of Dayton Rustproof, John Thomas was placed in charge of the nickel plating operation. Subsequently, Bob Schaeffer, an employee of DEI, had responsibility over the nickel plating operation.

32. From June, 1984 through approximately October, 1987, DEI utilized the same nickel bath formula which had been used by Dayton Rustproof.

33. DEI placed various orders with Bill Young & Company for proprietary and generic chemicals and equipment between June, 1984 and October, 1987.

34. At various times between June, 1984 and October 1987, DEI obtained proprietary chemicals directly from MacDermid Chemical Company. DEI did not receive any technical support from MacDermid, Inc. with respect to proprietary chemicals purchased directly from MacDermid, Inc.

35. As part of the technical support provided by Bill Young & Company to DEI,

Bob Greene did Hull Cell tests on the nickel baths. A Hull Cell is a miniature plating bath.

36. As an additional part of the technical support, Bob Greene took samples of the baths, sometimes testing them at DEI, sometimes having them tested at Bill Young & Company, and at times sending them to MacDermid, Inc. for testing. DEI was provided with copies of the results of the tests done by MacDermid. Bob Greene did the tests on a regular basis.

37. DEI hired Kevin Rommel to do some of the testing of its nickel operations in-house. DEI purchased its own Hull Cell tester and had the ability to conduct its own Hull Cell tests.

38. Bob Greene recognized problems in the nickel plating operation at DEI. In providing advice to assist in correcting the problems, he concentrated on areas other than the composition of the bath since historically, the low concentration bath had been run with effective results.

39. Bob Greene assisted DEI in setting up procedures to strip off chrome that was not satisfactorily plated, reactivate the part, and replate it with chrome.

40. Mr. Greene had a number of discussions with Mr. Borum and others at DEI regarding the subject of defectively plated nickel parts.

41. Bob Greene and Bill Young & Company provided the required technical service to DEI in a reasonably skillful or workmanlike manner.

### Stripping Process

42. Bob Greene advised DEI of a way to change the nickel stripping line to get away from using a cyanide stripping system. He advised DEI to use a new stripping system called Voltastrip. The changeover assisted DEI with respect to waste treatment.

43. DEI and its predecessor, Dayton Rustproof, stripped defectively plated nickel parts and replated them. Bob Greene advised DEI with respect to techniques and methods to use for the stripping operation. He also advised it on how to reactivate chrome parts after they had been stripped of chrome so that the nickel would not have to be stripped.

44. DEI ran a stripping line for defectively plated nickel parts. DEI has no business records to verify the running of the strip line. DEI did not maintain records of the number of rejected parts or number of parts stripped during the period of June, 1984 through October, 1987.

### Bidding on New Jobs

45. During the period from June 1, 1984 to October, 1987, DEI obtained new customers, among other methods, by obtaining requests to quote on jobs. Mr. Borum was the individual at DEI who bid on the jobs. In the bidding process, Mr. Borum had a pricing system for calculating the price to charge for plated parts.

46. Among other things, Mr. Borum took into consideration the costs to DEI to plate particular products with the intention of making a profit on the particular part.

47. In considering the amount to charge a customer, Mr. Borum considered his labor costs, including the amount of time it would take to run a particular part and how difficult it would be to provide a properly finished part to the customer.

48. In addition, Mr. Borum took into consideration cycle time, the ability of his employees, and the anticipated scrap rate, based on the company experience.

### Terms of Payment

49. Debtor's invoices to DEI contained the following language:

Products are warranted to be free from defects in material and workmanship at the time sold. The sole obligation of seller and manufacturer under this warranty shall be to replace any product defective at the time sold. Under no circumstances shall manufacturer or seller be liable for any loss, damage, or expense, direct or consequential, arising out of the use of or inability to use the product.

\*　　\*　　\*　　\*　　\*　　\*

A SERVICE CHARGE equal to 1½% per month (18% per annum) or the maximum rate allowed by applicable law, whichever is less, will be charged on past due invoices.

We find that this invoice represented the written contract interest rate between the parties. We further find that Bill Young & Company may charge interest of 18% on $96,665.18 from November 20, 1987 as specified by the contract on the bottom of the invoice.

50. As of November 20, 1987, DEI owed Bill Young & Company the sum of $96,665.18, which sum reflects past due invoices for goods and materials delivered to DEI by Bill Young & Company. DEI also owes the sum of $9,624.94 in interest only invoices. DEI does have a credit, however, of $4,159.26. Thus, the total amount owed to Bill Young & Company (absent interest from November 20, 1987) is $102,130.86.

### Discussion

We find that Mr. Borum was not the inexperienced entrepreneur which he attempted to portray at trial. He would have this Court believe that a man with his extensive technical and financial background would rely totally on one individual, Mr. Greene. Mr. Greene was a salesman for the debtor, Bill Young & Company and not even employed by Mr. Borum. Mr. Borum stated at trial that he could not afford a full-time employee such as Mr. Greene. Yet, this is exactly what Mr. Borum sought—full time expert technical assistance from Bill Young & Company.

While Mr. Borum may have been inexperienced in the electroplating business at first, he spent a good deal of time at Dayton Rustproofing prior to the purchase. Both before and after the purchase he had technical literature available to him and he testified that he understood the basic principles of electroplating.

Mr. Borum, Mr. Greene, and the other employees of DEI were trying to lower the high scrap rate. Nothing, however, prevented Mr. Borum from calling upon an expert, such as Mr. Benning, who testified at trial. Indeed, logic would dictate that if the people around you cannot help, you look elsewhere.

Mr. Greene did realize that there were problems at DEI. At trial he testified that he concentrated on looking for electro-mechanical problems versus any chemical problems. Nonetheless, we find Mr. Borum's extreme reliance on Mr. Greene to be unreasonable. In point of fact, Mr. Greene was only at DEI once a week.

In addition, we note that this chemical bath was inherited from Dayton Rustproofing and it apparently plated some products in an acceptable fashion while resulting in large scrap rates in others.

DEI has brought the counterclaim in contract and in negligence. This is, however, purely a contract action for chemicals sold by Bill Young & Company to DEI. As part of the selling of these chemicals, Bill Young & Company tested the baths to insure adequate compliance with the type of bath in use. Mr. Greene also recommended other changes which he thought might benefit DEI and in all probability, his employer, Bill Young & Company, too. One of the changes was the Voltastrip. This was the extent of the contract and Bill Young & Company performed it in a reasonable manner.

At no time did this case arise to the level of a negligence action. There was no duty assumed on the part of Bill Young & Company to lend *total* technical assistance to DEI.

The argument made by DEI that Bill Young & Company somehow waived interest on its interest-only invoices both before and after December 31, 1986 by not submitting additional interest-only invoices does not make sense to this Court.

Joint Exhibit 19 dated June 30, 1987 sets forth a payment schedule between Bill Young & Company and DEI. It was anticipated that all deliveries would be C.O.D. with a percentage added to each invoice until DEI was on a 90 day payment plan. A further term of this agreement was that Bill Young & Company would apply all payments to the oldest invoices. Although DEI made payments to Bill Young & Com-

pany after June 30, 1987, those payments were credited not to the oldest invoices, being the interest-only invoices, but to invoices for materials purchased for the period during January and February of 1987. This worked to DEI's benefit, however, in that Bill Young & Company did not charge interest on the interest-only invoices. Thus, the total amount of DEI's principal amount was being reduced. Furthermore, neither side adhered to the conditions set forth in Joint Exhibit 19. We therefore found that the 18% interest rate on the bottom of the invoices to be controlling.

*Conclusions of Law*

1. Bill Young & Company and DEI entered into a series of agreements for the delivery of equipment, as well as proprietary and generic chemicals.

2. Bill Young & Company and DEI did not enter into a contract for the provision of technical services aside from those services anticipated to be performed in connection with chemicals and equipment actually supplied by Bill Young & Company.

■ 3. To sustain a cause of action in negligence, DEI must present evidence of a duty owed by Bill Young & Company to DEI, a breach of that duty, and an injury proximately resulting from that breach. *See, e.g., Menifee v. Ohio Welding Prods., Inc.,* 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). The scope of the duty which arises in the context of the sale of goods and services is defined in part by reference to the parties' contractual obligations. *See, Whitaker–Merrell Co. v. Profit Counselors, Inc.,* 748 F.2d 354, 358 (6th Cir.1984).

■ 4. Bill Young & Company owed no duty to DEI with respect to the providing of technical support aside from the implied contractual duty to perform the technical services it was obligated to perform, in a reasonably skillful or workmanlike manner. *Cincinnati Gas & Electric Co. v. General Electric Co.,* 656 F.Supp. 49, 61 (S.D.Ohio 1986).

5. The nickel plating bath services by Bill Young & Company was within the range of acceptable plating solutions in the industry. The failure of Bill Young & Company to recommend a change in the plating solution does not, as a matter of law, constitute a failure to perform technical services in a reasonably skillful or workmanlike manner. *Cincinnati Gas & Electric Co. v. General Electric Co., Id.* at 61.

6. Bill Young & Company did not guarantee its infallibility, nor the infallibility of its sales representative. Bill Young & Company had a duty to provide acceptable technical services. The technical services provided were performed in a reasonably skillful or workmanlike manner, and therefore Bill Young & Company did not breach any duty to DEI. *Barton v. Ellis,* 34 Ohio App.3d 251, 252, 518 N.E.2d 18 (Franklin Co.1986).

■ Even if we were to find that DEI stated a cause of action in negligence, Bill Young & Company performed its service to sell chemicals and limited technical services in a reasonably skillful or workmanlike manner. *Invacare Corp. v. Sperry Corp.,* 612 F.Supp 448 (N.D.Ohio 1984).

7. The Trustee is entitled to judgment in his favor on DEI's counterclaim. DEI is not entitled to setoff, having proved no claim against Bill Young & Company.

8. The Trustee is entitled to judgment in his favor on his turnover complaint. The trustee should submit a judgment entry within 10 days of the date of this opinion setting forth a judgment plus interest calculated as specified herein.

9. As of November 20, 1987, DEI owed Bill Young & Company the sum of $96,665.18, which sum reflects past due invoices for goods and materials delivered to DEI by Bill Young & Company.

DEI also owes the sum of $9,624.94 in interest-only invoices. DEI does have a credit, however, of $4,159.26. Thus, the total amount owed to Bill Young & Company (absent interest from November 20, 1987) is $102,130.86.

10. Bill Young & Company may charge interest of 18% on $96,665.18 from November 20, 1987 as specified by the contract on

the bottom of the invoice. *See,* Ohio Rev. Code Ann. § 1343.03(A).

Because we have decided this case in the Trustee's favor against Dayton Electroplate, Inc. on its counterclaim, we do not reach the issue of the timeliness of Dayton Electroplate's proof of claim.

We also do not reach the issue of Bill Young & Company's disclaimer at the bottom of its invoice or DEI's damages because we found that Bill Young & Company performed its contract to sell chemicals and limited technical assistance in a reasonably skillful manner.

A motion for sanctions is also pending before the Court. The Court held this "discovery dispute" in abeyance pending trial (Doc. 25). The motion is DENIED. Each side is to bear its own costs.

IT IS SO ORDERED.